[Civ. No. 3176.   Third Appellate District.—February 17, 1927.]

MAGDELENE JAHNKE, as Executrix, etc., Respondent, v. CARL JAHNKE, Defendant; TITLE INSURANCE & TRUST COMPANY (a Corporation), Intervener and Appellant.

[1] FIXTURES—CHATTEL MORTGAGES — LEASES — TITLE TO ARTICLES — CHARACTER OF PROPERTY — FACT. — In an action to foreclose a chattel mortgage of articles in leased premises, involving the question of ownership of such articles as between the chattel mortgagee and the owner of the said premises, whether the articles were so affixed to the building as to become a part thereof and thereby become realty was a question of fact to be determined by the trial court upon the evidence presented.

[2] ID.—INTENT.—As a general rule, the intent of the parties is a controlling criterion in ascertaining whether property is permanently attached to the land or retains its identity as personalty; and the character of the annexation to the land or other realty and the use made of the property are important considerations, but in most cases are subsidiarily employed for the purpose of testing the intention of the parties.

[3] ID.—PROPERTY NOT PART OF REALTY—FINDINGS — EVIDENCE. — In such action, the findings of the trial court to the effect that the articles in question were not affixed to the building so far as to become a part thereof and thereby constitute a part of the realty, were supported by the evidence.

[4] ID.—TITLE—FINDING—SUFFICIENCY OF.—In such action, the finding of the trial court that the owner of the premises was not the owner of the property involved was a sufficient finding on the material and vital issue of the case, and made it unnecessary to

----

1.   See 6 R. C. L. 1092.
2.   See 6 R. C. L. 1062; 12 Cal. Jur. 562.

specifically find whether such property was mere personal property or fixtures.

[5] ID.—FINDINGS—ULTIMATE FACTS.—The general rule is that, if the findings, taken together, are such that the court can say the ultimate facts necessarily result therefrom, they are sufficient.

[6] ID.—CONSTRUCTION OF FINDINGS.—The findings made by the trial court must be given a liberal construction in support of the judgment and are, if possible, to be reconciled so as to prevent any conflict upon material issues.

[7] ID.—FINDINGS—JUDGMENT—MODIFICATION OF—APPEAL. — In such action, the judgment, which awards to the plaintiff (the chattel mortgagee) a certain article, will be modified on appeal so that such article may be awarded to the defendant, where the trial court made a finding that the defendant was the owner of the article in question.

(1) 26 **C. J.**, p. 654, n. 25.    (2) 26 **C. J.**, p. 654, n. 31, p. 656, n. 39.    (3) 4 **C. J.**, p. 883, n. 33; 26 **C. J.**, p. 697, n. 32.    (4) 26 **C. J.**, p. 697, n. 33; 38 **Cyc.**, p. 1984, n. 78.    (5) 38 **Cyc.**, p. 1982, n. 61.    (6) 4 **C. J.**, p. 775, n. 26, p. 780, n. 97 New.    (7) 4 **C. J.**, p. 1153, n. 46.

APPEAL from a judgment of the Superior Court of Los Angeles County. W. P. Cary, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

Lester W. Roth and Louis M. Lissner for Appellant.

Warren L. Williams and Seymour S. Silverton for Respondent.

PRESTON, J., *pro tem.*—This is an appeal by the intervener, Title Insurance & Trust Company, a corporation.

The facts are these: On March 15, 1915, one M. Lissner executed a lease to Adolph Jahnke for certain real property situate at 524 South Spring Street in the city of Los Angeles, known as "Jahnke's Tavern," for a period of approximately seven years; said lease expiring on March 31, 1922. Immediately after the execution of the lease, the said lessee, Adolph Jahnke, proceeded to fit up, alter, and remodel the

leased premises (Jahnke's Tavern) for the purpose of conducting a restaurant and cafe business therein, and installed therein certain property which forms the subject matter of this action.

On June 7, 1917, the said M. Lissner and the other owners of the building conveyed the "Lissner Building," of which "Jahnke's Tavern" was a part, to the said Title Insurance & Trust Company, the intervener and appellant in this action. Prior to the expiration of said lease the said Adolph Jahnke sold the said "Jahnke's Tavern" and assigned the lease and all rights thereunder to the defendant Carl Jahnke and one George Kohn, and on or about March 13, 1922, Kohn sold all his interest to the said Carl Jahnke. On March 13, 1922, and before the expiration of the lease, a chattel mortgage was executed by Carl Jahnke to the said Adolph Jahnke. Said chattel mortgage was given as security for fifteen (15) $1,000 promissory notes, and said mortgage included certain property in the said "Jahnke Tavern," and included the property claimed by said intervener, Title Insurance & Trust Company.

The said Adolph Jahnke died testate in the city of Los Angeles on the eighteenth day of March, 1923, and thereafter his will was duly admitted to probate, and on the 25th of April, 1923, letters testamentary were issued to Magdelene Jahnke, the plaintiff in this action.

None of the notes or any interest thereon was paid, and on the 21st of June, 1923, the said Magdelene Jahnke, as executrix of the estate of Adolph Jahnke, brought this action to foreclose said chattel mortgage.

On the 16th of July, 1923, said Title Insurance & Trust Company intervened in said action and filed its complaint in intervention against the plaintiff herein, claiming to own certain property located in the said "Jahnke Tavern," a portion of which is included within said chattel mortgage. A trial was had before the court sitting without a jury, and the court found that the plaintiff was entitled to judgment, and that the said chattel mortgage be foreclosed as to the following chattels enumerated therein, and located at 524 South Spring Street in the city of Los Angeles, in what is known as the "Jahnke Tavern," to wit: Sixteen windows and window insets, two hardwood floors, one in basement and

one in grill-room, Viking ship, woodwork in grill-room, two plaster of paris boats, sixteen reflectors for windows, one galvanized iron range hood, all looking-glasses.

From this portion of the judgment the intervener appeals. Title Insurance & Trust Company was declared to be the owner of certain other personal property described in the mortgage.

The said defendant Carl Jahnke, remained in possession of the premises known as "Jahnke Tavern" as a month to month tenant, until on or about the 28th of June, 1923, and about said time he was halted in his attempt to remove said property heretofore mentioned by an injunction from the intervener.

The appellant, Title Insurance & Trust Company, urges a number of grounds for a reversal of that part of the judgment appealed from.

The principal contention of appellant is that the above-enumerated articles must be classed as either "fixtures" or "trade fixtures."

It seems to us, however, that we must first determine whether the articles of property involved are fixtures or mere personal property, for unless said articles are affixed to the realty, the question of fixtures, or trade fixtures, becomes immaterial.

Section 658 of the Civil Code provides: "Real or immovable property consists of: 1. Land; 2. That which is affixed to land; 3. That which is incidental or appurtenant to land; 4. That which is immovable by law."

Section 663 of the same code provides: "Every kind of property that is not real is personal."

Therefore, the articles in question in this case were personalty unless they were affixed to the land, for it is only in that sense that they can be brought within the above classification of real property.

Section 660 of the Civil Code also provides: "A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws."

It has been held that this section is simply a rule for general guidance, concerning itself more with ultimate than probative facts. (*Gosliner* v. *Briones,* 187 Cal. 557 [204 Pac. 19].)

[1] Whether the articles involved in this case were so affixed to the building as to become a part thereof and thereby become realty was a question of fact to be determined by the trial court upon the evidence presented. (*Gosliner* v. *Briones, supra; Pennybecker* v. *McDougal,* 48 Cal. 160; *Miller* v. *Waddingham,* 91 Cal. 377 [13 L. R. A. 680, 27 Pac. 750].)

[2] As a general rule, the intent of the parties is a controlling criterion in ascertaining whether property is permanently attached to the land or retains its identity as personalty; the character of the annexation to the land or other realty and the use made of the property are important considerations, but in most cases are subsidiarily employed for the purpose of testing the intention of the parties. (*Hendy* v. *Dinkerhoff,* 57 Cal. 3 [40 Am. Rep. 107]; *Lavenson* v. *Standard Soap Co.,* 80 Cal. 245 [13 Am. St. Rep. 147, 22 Pac. 184]; *Jordan* v. *Myres,* 126 Cal. 565 [58 Pac. 1061]; *Western etc. Tel. Co.* v. *Modesto Irr. Co.,* 149 Cal. 662 [9 Ann. Cas. 1190, 87 Pac. 190]; *Dutton* v. *Ensley,* 21 Ind. App. 46 [69 Am. St. Rep. 340, 51 N. E. 380]; *Gosliner* v. *Briones, supra.*)

[3] In the case at bar the trial court found by implication at least that the articles of property here involved were not affixed to the building so as to become a part thereof, and thereby constitute a part of the realty, and the findings of the court in this regard seem amply supported by the evidence.

Arthur S. Heineman, a witness called by the intervener, testified in substance, as follows: "That he drew the plans and specifications for the fixtures in controversy; that he received all of his instructions concerning the drawing of the blue-prints and work from Mr. A. Jahnke, and that his agreement concerning the matter was with him; that the window framing and the structural partitions in the walls could be removed by drawing the tacks; that that would leave an unfinished wall; that when the window is taken out, the wall is seen through the frame way; that the sash and glasses removed by taking out the bolts and turning

the fastenings; that he had about twelve conferences with Mr. Jahnke before the plans were drawn; that Mr. A. Jahnke instructed him to install the things down there in such a manner that they could be removed; that the super-wainscoting in the west end of the basement is of sycamore and is attached to the hard wood floor resting on the sleepers; that it was nailed to the floor or toe nailed and was put up in sections and not constructed on the premises; that there is running from the wainscoting a balustrade or rail, about three feet high and about twelve feet long, running east and running to another short balustrade or block against which it rests; that they were brought into the establishment by Mr. Cedarquist and set up; that no part of them was made on the premises; that he installed the flooring on the main floor or in the grill room, and that his recollection is that this floor was lagged and that the sleepers were lagged to the floor, and to move the flooring it would be necessary to unscrew that bolt and leave a bolt seat there; that there is nothing that would injure the cement flooring other than to make a little hole with an iron nut in it; that he installed the plaster boats; that they are light troughs and hang by straps from the rafters and are supported by means of wrought iron straps and the straps are screwed by means of bolts into the floor beams; that the straps are not attached to the bolts in any way, and the boats could be removed by being slipped out from the straps; that the fixtures were built in the basement and grill room and were built especially for restaurant and cafe purposes; that the fixtures could be taken out and put in another place of similar dimensions or a place of different dimensions; that the panels and walls could all be taken out and put in another place on a floor with modifications; that at the time the wainscoting was installed it was figured at about $1.00 a foot but that it was worth about $3.00 at that time; that he thought it could be taken out and used elsewhere at a profit.''

The witness N. H. Cedarquist testified as follows: ''I put in the panels in the tavern. They were fabricated at the factory and assembled in the grill room. They can be taken out by removing them and they can be removed without breaking them. We can remove the panel and take it right out through the doors. You do not have to take any of

the walls out. The hard wood flooring in the upstairs grill, as far as I can remember, was nailed to sleepers which were laid on the cement floor. The sleepers were not tied into the wall. All the stuff can be taken out and put in another building. I constructed the windows on the west end and on the south side of the basement, and the frames and the sash in the frames were made at the factory complete. The frames were then shoved right into the openings which were made on the job previously. The frame is in there loose and that applies to the windows all the way around. The windows could be taken out and used in any other place under the same conditions. I do a lot of work fixing windows for stores and offices and banks and the specifications generally provide that they can be put in and taken out and moved elsewhere. I made the Viking ship. It was built at the factory and brought up, and it was built so it could be stuck right over the end of the structure of the stairway leading downstairs. The Viking ship was constructed on the platform of that stairway on a frame set up against a cement. The sashes down stairs, I believe, could be taken out by pulling them out, there are no nails, tacks or screws there anywhere. It is not even tacked to the wooden structure. I would say that they would be sold at $3.00 a foot. We often use fixtures that are built specially for one place in a place of different dimensions. The staff work could be removed without removing the panels, but the panels could not be removed without removing the staff work. If the Viking ship was held in place by an expansion bolt, the bolt would not be imbedded in the cement. The socket would be imbedded in the cement and the bolt would be in the railing. By removing the bolt, the socket would be left in the cement. The sash is held by a loose pin butt, the same as these lights are here above, with hooks, or either with springs. A loose pin butt is where you pull a peg and take the sash out.''

Carl Jahnke, the defendant, testified that he was in the tavern while the panel in the grill-room was being done, and that said panel work was nailed on the skeleton and primed, and tar paper used to preserve the wood from moisture, and that the said paneling was not nailed to the wall. He further testified as follows: ''The Viking ship was brought down all intact and put up against this rein-

forced concrete base in a kind of toggle-board, I would call it. It has since been removed from the place where it used to be. The hard wood flooring in the basement was laid on 2x4, and the hard wood is nailed on the 2x4 and the 2x4 is just raised on the concrete. They are not nailed to the building in any way. The other floor in the west end of the basement is laid practically the same way. The floor at the west end was laid on sleepers of 2x4 and was toe nailed—it was not nailed in any way to the building and the sleepers were not attached to the concrete or the building. The plaster of paris boats are hung with four chains and the chains have got a little plug that is screwed into the ceiling and the chain is attached to the plug and connected on to the hook that is on the side of the boat. The boats could be removed by being lifted off the screws. The window reflectors in the windows have mirrors in them. They hang down on a piece of wire from a gas or water pipe from that fake wall, and you get the effect of sunshine in the windows. There were about sixteen of them altogether.''

There is other testimony to the same effect, and also testimony to the effect that negotiations were carried on between the appellant and Carl Jahnke looking to the execution of a new lease, but a new lease was never actually executed, and that was the reason given by Carl Jahnke for continuing in the premises after the expiration of the original lease. There is also some conflict in the testimony given, but that was for the trial court's determination, and there is ample evidence in the record to support the trial court's conclusion that the articles never became affixed to the building so as to become a part of the realty.

[4] Appellant also contends that the trial court failed to find on material and vital issues of the case, because it did not find whether the property in question was "personal property," "trade fixtures," or "fixtures." There is no merit in this contention. The court did find, however, that appellant and intervener *was not the owner of the property involved.* This finding is adverse to appellant and is a sufficient finding on the material and vital issue of the case. The trial court did not, in express language, find that the property in question had not become a part of the realty, but in view of the foregoing finding that said property was not the property of appellant a specific finding whether it

was mere personal property, or fixtures, was, in the instant case, entirely unnecessary. **[5]** The general rule is this: If the findings, taken together, are such that the court can say the ultimate facts necessarily result therefrom, they are sufficient. (*Tower* v. *Wilson,* 45 Cal. App. 123 [188 Pac. 87]; *Breyfogle* v. *Tighe,* 58 Cal. App. 304 [208 Pac. 1008].) **[6]** Moreover, the findings made by the trial court must be given a liberal construction in support of the judgment and are, if possible, to be reconciled so as to prevent any conflict upon material issues. (*Price* v. *Occidental Life Ins. Co.,* 169 Cal. 800 [147 Pac. 1175], and cases therein cited.)

Therefore, giving the findings in the case at bar a liberal construction, it necessarily results therefrom that the property involved herein did not become a part of the building in which it was installed, and, therefore, did not become a part of the realty, but retained the character of personal property.

**[7]** It is also contended by appellant that the court found that appellant and intervener was the owner of one hardwood floor in the grill-room and that the plaintiff and respondent was the owner of one hardwood floor in the basement, but that the judgment provided that the two hardwood floors, one in the basement and one in the grill-room, be awarded to plaintiff and respondent. An examination of the record convinces us that this contention must be sustained. The hardwood floor in the grill-room should, under the findings, have been awarded to the appellant and intervener herein. This is manifestly an inadvertence, and the judgment should be modified by awarding the hardwood floor in the grill-room to the appellant and intervener herein.

The judgment is modified by striking from paragraph IV thereof, "2 hardwood floors, 1 in basement—1 in grill room," and inserting in lieu thereof, "1 hardwood floor in basement," and by inserting at the end of paragraph V, "1 hardwood floor in grill room." As so modified, the judgment is affirmed, the appellant to recover costs of appeal.

Plummer, J., and Finch, P. J., concurred.