Appellate Department, Superior Court, San Diego.

[Civ. A. No. 111359.   April 3, 1943.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Appellant, v. WALTER CHURCH, Respondent.

Holloway Jones, George G. Hadley, Lincoln V. Johnson, Francis J. Carr and Jack M. Howard for Appellant.

Irve C. Boldman and Bertrand L. Comparet for Respondent.

HAINES, P. J.—In a certain cause numbered 106244 heretofore tried in the Superior Court of San Diego County, the People of the State of California sought to condemn for right-of-way purposes incident to the widening of a public highway certain lands, which included those known as lots 2 to 6, both inclusive, of West Atlantic Street Addition, in the City of San Diego. Among the defendants in that action were one Jane P. Joslyn, the owner of the five lots, and one Walter Church, the defendant and respondent in the instant case. The latter was lessee under a lease from said Jane P. Joslyn running by its terms from March 20, 1939, to and including March 19, 1944, and occupied the premises, consisting of the five lots, under such lease. He was engaged in the business of operating a service station in connection with which he had installed on the property certain equipment which forms the subject of the present action, to wit, one Tokheim Kerosene Pump, two Wayne Automatic Computing Gas Pumps, three Red Seal Automatic Computing Gas Pumps, one Aqua System Automatic Computing Gas Pump

and one pneumatic auto hoist. He also had on the premises an air compressor originally included in the description in the complaint of the property here involved but as to which appellants abandoned at the trial any claim. There were also on the premises certain buildings belonging to the lessor and occupied by the tenant, with which we are not here concerned, and certain iron kerosene and gasoline tanks buried in the ground which are not involved in the instant case.

In said former action 106244 a judgment of condemnation was entered as against both Mrs. Joslyn and Church, the lessee, pursuant to the verdict of a jury which awarded compensation for the real property and "improvements" but did not further describe the latter or specify the equipment. The amount of the compensation awarded for the property taken was by written stipulation between the said Jane P. Joslyn and the said Walter Church apportioned between them. Before relinquishing possession of the leased property Church removed the said pumps and pneumatic hoist and claims that he was entitled to do so as their owner, whereas apparently the People of the State of California claim that this property was carried by the condemnation decree as part of the realty and have brought the present action in claim and delivery to recover the same or its value, the amount of which is admitted by the pleadings to be $1,745. Judgment was given by the trial court for the defendant and this appeal follows:

What are referred to in the record as the kerosene and distillate pumps, were while on the premises set on wooden blocks which rested on the ground but were not fastened to these blocks. Neither were the blocks fastened to the ground (unless by pipes, as hereinafter described). The record, however, only identifies one of the pumps as a kerosene pump and so far as can be ascertained from it if there were any distillate pumps they are not involved in this present action. Except the one kerosene pump, all of the pumps mentioned in the complaint are therein referred to as "gas pumps," which we understand to mean gasoline pumps. These rested of their own weight on cement islands between two driveways on the property but were not bolted to the islands. However, there were holes in the islands of twelve-inch diameter, through which pipes ran loosely, connecting the pumps with the iron tanks hereinbefore referred to buried in the ground below. The tanks contained the gasoline.

One of the pumps which was operated by electricity was also equipped with a pipe through which the electrical current was conducted. In the case of each gasoline pump the pipe connecting it with its tank was of one and one-half inch diameter and screwed to the pipe within the pump by a single screw joint or ''union'' which was enough to hold the pump ''pretty rigid.'' The pumps could be removed by unscrewing this joint and were removed and replaced by others at intervals of something like three months.

The record speaks of one or more kerosene tanks as well as those containing gasoline, buried in the ground, so it is probably inferable that the one kerosene pump above referred to was also connected by piping with its tank.

The pneumatic hoist consisted of a metal cylinder thirteen inches in diameter supporting a platform on which cars could be raised. It was, when used, elevated by compressed air from the above mentioned compressor with which it was connected. Respondent described the manner of installation of the hoist as follows:

''We dug a round hole and right at the bottom of the hoist we put just a bed of cement. We set the hoist just on top of that cement and then we put a collar around that. I think that was fourteen inches and it was twelve inches thick, and just put a collar around and we tamped it down with loose dirt. . . . The hoist is on cement. The hoist is just about seven feet, between six and seven feet. When we let the hoist go to the bottom, the base of that cement, it just rested on the concrete, on the collar, and it raised right off from the bottom. . . . There was no collar from the bottom of the hoist up to the top. There was fourteen square blocks fourteen inches away from the hoist on each side. I think that is the size of it.''

He testified further that at the bottom of the hole he laid this cement block or base and set the hoist right down on top of it, that the cylinder was really the whole hoist and that when it was pulled out it merely left a hole which respondent filled up. Counsel, however, have explained in the argument that the hoist really included two cylinders, a solid center one working up and down within a hollow outer one. The ''hole'' referred to by the defendant was left when both were pulled out.

Section 1248 of the Code of Civil Procedure (subdivision 1) requires that in an eminent domain proceeding there be as-

certained and assessed ''the value of the property sought to be condemned, and all improvements thereon pertaining to the realty. . . . ''

■ It must, therefore, be taken as true that in the amount awarded in said cause 106244 for the property condemned, was included just compensation not only for the bare land involved but also for ''all improvements thereon pertaining to the realty,'' and the question to be now decided is whether the equipment described in the complaint (exclusive of the compressor) did or did not constitute improvements ''pertaining to the realty.''

There are also to be considered in the determination of that question sections 658 and 660 of the Civil Code which are as follows:

''658. (DEFINITION OF REAL PROPERTY: SEVERANCE BY AGREEMENT.) Real or immovable property consists of:

''1. Land;

''2. That which is affixed to land;

''3. That which is incidental or appurtenant to land;

''4. That which is immovable by law; except that for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sales of goods.''

''660. (DEFINITION OF FIXTURES: SEVERANCE BY AGREEMENT.) A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws; except that for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sales of goods.''

We are warned, however, by the decisions that these tests are not necessarily to be given too literal an application. It was said in *Gosliner* v. *Briones,* 187 Cal. 557, 559 [204 P. 19], quoted and reiterated in *Fisher* v. *Pennington,* 116 Cal.App. 248, 250 [2 P.2d 518], that:

"This section of the code is simply a rule for general guidance, concerning itself more with ultimate than with probative facts. Whether or not in any case a building is 'permanently resting upon' the soil so as to be deemed 'affixed to the land' within the meaning of the section remains a question of fact to be determined upon the evidence of that case."

It is claimed, in respondent's behalf, that the equipment involved must be deemed to have been personal property rather than a part of the realty (1) because of the terms of the lease under which respondent was up to the time of the condemnation in possession of the premises, (2) by virtue of the law relative to trade fixtures, independently of the lease and (3) because (as respondent's counsel assert) it was by stipulation conceded at the trial in the municipal court that the equipment was personal property.

The last contention can be at once disposed of. The occurrence referred to at the trial was as follows:

MR. BOLDMAN: "We want to introduce——"

MR. JOHNSON: "It will be stipulated that was the personal property of the landlord and tenant."

MR. BOLDMAN: "I was just going to read the portion——"

MR. JOHNSON: "You might read it if you care to."

MR. BOLDMAN: "The lease gave the tenant the right to remove his fixtures. That was the lease under which Walter Church had installed the fixtures and held them at the time of the condemnation. If that is stipulated to we won't put the lease in."

MR. JOHNSON: "It is so stipulated."

While the words of Mr. Johnson: "It will be stipulated that was the personal property of the landlord and tenant," taken alone might lend some color to respondent's claim, it is clear enough from the passage between counsel above referred to that what happened was merely that Mr. Boldman was about to introduce the lease, and started to do so with the words "We want to introduce . . .," whereupon Mr. Johnson broke in with the stipulation now in question and that all he meant by the stipulation was that, according to the terms of the lease, the fixtures put in by the tenant were to remain the tenant's property and subject to removal by him. It cannot be believed that by the language used Mr. Johnson as counsel for the People intended to stipulate that as between the respondent and the State, the equipment was personal

property—which would be tantamount to stipulating that appellants had no case.

The admitted circumstance that as between the landlady, Mrs. Joslyn, and the tenant, respondent Church, the equipment here involved was always the property of the tenant and subject to removal by him during the continuance of his lease or at its termination, is not necessarily conclusive of the situation as between Church, the tenant, and the State, which never became his landlord but was, rather, the purchaser of his leasehold interest, at the same time that it became the purchaser of his landlady's reversion. As was said in *City of Los Angeles* v. *Hughes*, 202 Cal. 731, 737 [262 P. 737]:

"It has often been held that property affixed to land which, as between the parties shall be deemed to be personal property, still retains its natural character as realty as to third persons. (*McNally* v. *Connolly*, 70 Cal. 3 [11 P. 320]; *San Francisco Breweries* v. *Schurtz*, 104 Cal. 420 [38 P. 92]; *Oakland Bank of Savings* v. *California Pressed Brick Co.*, 183 Cal. 295 [191 P. 524] )."

In *United States* v. *Seagren*, 50 F.2d 333 [75 A.L.R. 1941], decided in 1931 by the Court of Appeals of the District of Columbia, certain lots had been leased to the appellee Seagren "who built and conducted thereon a gasoline filling station on a large scale, with the usual equipment of such establishment, consisting mainly of two small fireproof houses, a work shop, divers tanks for gasoline and oil three feet underground, with the pipes, pumps and other paraphernalia for operation, the property being covered with a concrete surface or roadway and enclosed by an iron fence five feet in height." The original lease gave Seagren, the tenant, authority to erect buildings, implant tanks, and other structures, and "to take away and remove the said buildings and other structures" within thirty days from the termination of the lease. Various renewals of the lease always reserved to the tenant the right at the termination of the lease to remove all structures placed upon the land by him. The interests of both landlord and tenant were taken by the United States in an eminent domain proceeding, but the government took an appeal from the judgment in that it included an allowance to the tenant for his structures, claiming that the agreement between landlord and tenant permitting the latter to remove

his improvements precluded the tenant from recovery from the government as condemner for their value. The Court, however, held otherwise, saying that "the agreement for removal made by these parties at another time, for another purpose, and affecting no interests but their own, must be rejected here as irrelevant, when set up by the United States to control its condemnation proceeding against the tenant's interest in the land."

The court went on to quote Nichols on Eminent Domain (2d ed.) vol. 1, sec. 234, as follows:

"It frequently happens that, in the case of a lease for a long term of years, the tenant erects buildings upon the leased land or puts fixtures into the building for his own use. It is well settled that, even if the buildings or fixtures are attached to the real estate and would pass with a conveyance of the land, as between landlord and tenant they remain personal property, and, in the absence of special agreement to the contrary, may be removed by the tenant at any time during the continuation of the lease provided such removal may be made without injury to the freehold. This rule is however entirely for the protection of the tenant and cannot be invoked by the condemning party. If the buildings or fixtures are attached to the real estate, they must be treated as real estate in determining the total award, but in apportioning the award they are treated as personal property and credited to the tenant."

To the same general effect are *In re Acquiring Property on North River*, 103 N.Y.S. 908, *In re Willcox*, 165 App.Div. 197 [151 N.Y.S. 141] and *In re Allen Street*, 256 N.Y. 236 [176 N.E. 377].

In *McNally* v. *Connolly*, 70 Cal. 3, *supra*, not indeed a condemnation case but cited in *City of Los Angeles* v. *Hughes*, *supra*, it was held (we quote from the syllabus) that:

"An engine, boiler, and machinery for a flouring mill, erected by a lessee on the demised premises, and securely attached thereto by bolts and screws, are fixtures as between him and his attaching creditors, notwithstanding an agreement between the lessor and lessee that the latter should be at liberty to remove the machinery upon the expiration of the lease."

It was in the body of the opinion (pp. 5, 6) said:

"The fact that, as against the lessor, Connolly & Wheat had the right upon the expiration of the lease to remove the

machinery is unimportant. The question here is, How does the law regard it as between debtor and creditor? It is provided by statute in this state, that 'a thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws.' (Civ. Code, sec. 660). It is clear that under this definition the mill and machinery in question constituted fixtures.''

So, too, in *San Francisco Breweries* v. *Schurtz*, 104 Cal. 420 [38 P. 92], where a lessee had used the leased premises as a saloon ''and had caused to be attached to them certain personal property used in conducting his business'' the court (p. 427) said:

''But the fixtures attached by a lessee to leased property become a part of the realty and remain so until they are severed. While so attached a mortgage of the leasehold estate covers the fixtures, and on foreclosure they are sold as a part of the realty.'' (See, also, *Boyle Ice Machine Co.* v. *Gould*, 73 Cal. 153 [14 P. 609].)

It is moreover, undoubtedly the general rule that as between vendor and vendee, the rules for determining what is a part of the realty are regularly construed against the seller. (*Fratt* v. *Whittier*, 58 Cal. 126 [41 Am.Rep. 251]. )

■ Unfortunately a great deal of confusion in considering ·when it is that what was personal property has become a part of the land has been introduced by the different senses in which the decisions use the word ''fixture.'' According to the more common and probably the better usage, a ''fixture'' is by definition a part of the realty. The word has, however, also a secondary meaning. In Webster's New International Dictionary we find ''fixture'' as used in the law, defined as follows:

''LAW. Anything of an accessory character annexed to houses and lands, so as to legally constitute a part thereof;— often called an *immovable fixture*. The law on the subject of *fixtures* varies with different subjects and in different jurisdictions. In general, however, a chattel will become a *fixture* if it is annexed in a manner relatively permanent and is of such a nature as to be suitable for use as part of the land to which it is annexed. Things fixed to the freehold for purposes

of trade or manufacture (called trade fixtures) may in general be taken away when their removal is not contrary to a prevailing practice. In general the rule as between landlord and tenant favors the tenant, as between grantor and grantee and mortgagor and mortgagee it favors the grantee and mortgagee in doubtful cases, and as between heir and executor removal will not be permitted where it will injure the freehold.

"LAW. Less commonly, a personal chattel annexed to lands or tenements but removable by the person annexing them, or his personal representative, without the consent of the owner of the real estate;—often called a movable fixture."

It is probably fair to say that of these two definations the former is not only the one preferred by lexicographers, but it is the one sanctioned by the great weight of authority, both without this state and within it.

"A 'fixture' is an article which was a chattel, but which by being physically annexed or affixed to realty by someone having an interest in the soil becomes part and parcel of it." (*Commercial Finance Co.* v. *Brooksville Hotel Co.,* 98 Fla. 410 [123 So. 814, 64 A.L.A. 1219].)

"A 'fixture' is a thing that originally was a chattel, but which has become a part of the real estate by reason of attachment thereto by one having an interest therein." (*Ochs* v. *Tilton,* 181 Ind. 81 [103 N.E. 837, 838].)

"A 'fixture' is that which was once a chattel, but which, by being affixed to realty or appurtenances, at least by juxtaposition, for use in connection therewith, has become a part and parcel of it." (*Inhabitants of Whiting* v. *Inhabitants of Lubec,* 121 Me. 121 [115 A. 896, 899].)

"A 'fixture' is an article which was a chattel, but by being physically annexed to the realty, by one having an interest in the soil, becomes a part and parcel of it." (*Padgett* v. *Cleveland,* 33 S.C. 339 [11 S.E. 1069].)

So, too, in California it was laid down in the case of *Hegard* v. *California Insurance Co.,* 2 Cal.Unrep. 663, 670 [11 P. 594], that "the term 'fixture' has a well ascertained and certain meaning as something affixed to realty." So also it was said in *Earle* v. *Kelly,* 21 Cal.App. 480, 483 [132 P. 262], that "fixtures are those things which are so attached to realty as to be considered in law a part thereof." Again in *R. Barcroft & Sons Co.* v. *Cullen,* 217 Cal. 708, 711 [20 P.2d 665], it was said that:

"Generally fixtures are those things which are so attached

to the realty as to be considered in law a part thereof," after which the court proceeded to add that: "They are defined by Section 660 of the Civil Code," appending a quotation from that section.

In *Western Union Telegraph Co.* v. *Modesto Irrigation Co.*, 149 Cal. 662 [87 P. 190, 9 Ann.Cas. 1190], in an opinion written by a very distinguished judge it was said (p. 665):

"There is no doubt that articles of personal property owned by one person may be attached to land owned by another without becoming a part of the realty and without losing their character as personal property. For instance, trade fixtures annexed to land by tenants do not become part of the freehold even without any special agreement. And the general rule is that the intention of the parties determines the character of the annexed chattels and that they remain personal property if that be the intention of the parties when they are attached. This rule applies to third parties acquiring an interest in the land—as mortgagees, grantees, etc.,—except where the mode of annexation is such that the attached property loses its character as personal property—as where it could not be removed without destroying it, or where it is necessary to the support or safety of that to which it is attached. In *Hendy* v. *Dinkerhoff*, 57 Cal. 3 [40 Am.Rep. 107], the court say: 'It is well settled, as said by the court of appeals of New York in *Tifft* v. *Horton*, 53 N.Y. 380, [13 Am.Rep. 537], 'that chattels may be annexed to the real estate and still retain their character as personal property.' (See *Voorhees* v. *McGinnis*, 48 N.Y. 278, and cases there cited.) Of the various circumstances which may determine whether in any case this character is or is not retained, the intention with which they are annexed is one; and if the intention is that they shall not by annexation become a part of the freehold, as a general rule they will not. The limitation to this is where the subject or mode of annexation is such that the attributes of personal property cannot be predicated of the thing in controversy, (*Ford* v. *Cobb*, 20 N.Y. 344), as when the property could not be removed without practically destroying it, or where it or part of it is essential to the support of that to which it is attached."

If the articles of equipment under discussion constituted fixtures within the meaning of the former of the above two definitions, then it is important as above suggested to note

that the relations between respondent Church and the People of the State of California were, in effect, those of seller and purchaser and that there is some analogy to the situation as it would have been, had Church, without first removing his equipment, sold his leasehold to the State under a contract making no provision for its removal. The relations between a condemnee and a condemnor have often been likened in decisions to those between a seller and a purchaser. For example, in *Jackson* v. *State of New York*, 213 N.Y. 34 [106 N.E. 758, Ann.Cas. 1916C, 779, L.R.A. 1915D, 492], a decision by Mr. Justice Cardozo, it was said, (pp. 35, 36) :

"Condemnation is an enforced sale and the State stands toward the owner as buyer towards seller. On that basis the rights and duties of each must be determined. It is intolerable that the State after condemning a factory or warehouse, should surrender to the owner a stock of secondhand machinery and in so doing discharge the full measure of its duty. . . . An appropriation of land, unless qualified when made, is an appropriation of all that is annexed to the land, whether qualified as buildings or as fixtures, and so it has frequently been held."

When all possible weight is given, however, to this point of view, the analogy in a condemnation case to the relation between seller and purchaser under a contract is not a perfect one, in that the parties do not stand on an equal footing. If the transaction is a sale, it is yet, as described in the last mentioned citation, a "forced sale" and, therefore contrary to the general rule prevailing between vendor and vendee, as against the condemnor, its terms should be strictly construed. Even if it be assumed, despite the existing confusion in the use of terms, that a "fixture" is, by that token, a part of the land, to say that is not to determine whether, in any given case, the annexation has been sufficiently complete to make what was once a chattel thenceforth a "fixture."

The question of the intent with which the annexation has been made is often mentioned in the decisions as a circumstance of great importance in determining that question. As we have seen, in litigation between landlord and tenant, the latter's intent in making the annexation is generally treated as the controlling test as to whether or not the chattel annexed has become a fixture. As we have seen, on the other hand, in litigation between a vendor and vendee, where no

express agreement on the subject has been made between them, the intent of the vendor in making the annexation is treated as less material as between him and the vendee. In condemnation suits, however, where the question of what has become a part of the realty has been involved, the decisions seem to consider as of great importance the intent with which a tenant has placed what were originally chattels on the property, in spite of the fact that the condemnor can, in the nature of things, have been no party to such intent, whatever it was. Thus in *County of Los Angeles* v. *Signal Realty Co.*, 86 Cal.App. 704 [261 P. 536], where the County condemned for street widening five feet along the northerly boundary of certain property occupied by store buildings, the contention of one Culver, a tenant of one of the buildings used as a drug store, that he was entitled to compensation for certain trade fixtures located on the part of the premises taken was rejected, the Court saying (pp. 710, 711):

"Appellant's authorities relate wholly to permanent fixtures which constitute improvements in the ordinary use of that term, and we think they are not in point. Appellant's store fixtures consisted of screen doors, shelving, window display cases, signs, awnings, etc., much of which, it is said, were fastened to the building by nails, screws, and bolts. Testifying in his own behalf, however, this appellant said: 'The property I have testified to is property I have paid for. It belongs to me, and I knew when I paid for it that I had a right to remove it at the termination of the lease.' It cannot be doubted that such was the intention of the parties, and there is nothing in the record tending to indicate that the Realty Company claimed the right to ownership of its tenant's trade fixtures at any time. There is some evidence to the effect that even after severance there would remain more room than was actually utilized by Culver, and while he might prefer to remodel or replace certain fixtures following their removal, at considerable expense to himself, it remains that the plaintiff took no part of his property, and the cost of removal was not a compensable item. In *Jahnke* v. *Jahnke*, 81 Cal.App. 387 [253 P. 752], it was held that as a general rule the question as to whether articles are so affixed as to become a part of the realty is one of fact to be determined by the trial court upon the evidence presented, and that the intent of the parties is the controlling criterion. (Citing *Gosliner* v. *Briones*,

187 Cal. 557 [204 P. 19]; *Pennybecker* v. *McDougal*, 48 Cal. 160; *Miller* v. *Waddingham*, 91 Cal. 377 [13 L.R.A. 680, 27 P. 750]; *Hendy* v. *Dinkerhoff*, 57 Cal. 3 [40 Am.Rep. 107]; *Lavenson* v. *Standard Soap Co.*, 80 Cal. 245 [13 Am.St.Rep. 147, 22 P. 184]; *Jordan* v. *Myers*, 126 Cal. 565 [58 P. 1061]; *Western Union Tel. Co.* v. *Modesto Irr. Co.*, 149 Cal. 662 [9 Ann.Cas. 1190, 87 P. 190].) Here, as in *Jahnke* v. *Jahnke*, 'the trial court found by implication at least that the articles of property involved were not affixed to the building so as to become a part thereof, and thereby constitute a part of the realty, and the findings of the court in this regard seem amply supported by the evidence.' A case strikingly analogous to the instant one is *New York C. & H. R. R. Co.* v. *Albany S. T. Co.*, 161 App.Div. 329 [146 N.Y.S. 674], wherein it was held that evidence as to the value and cost of removal of personal property was properly excluded.''

So also in *City of Los Angeles* v. *Klinker*, 219 Cal. 198 [25 P.2d 826, 90 A.L.R. 148], in which, and in the cases consolidated with which, the question arose whether the city of Los Angeles, in condemning the property occupied by the newspaper plant of the Los Angeles Times, was bound to pay for the processing machinery of that enterprise, the Supreme Court of this state, though in the circumstances of that case it held that compensation for the machinery must be allowed, reached that conclusion by considering, among other things, the intent of the publishing company to annex it permanently to the realty in installing it. This is apparent from the citations contained in the following extracts from the opinion (pp. 206-207):

''All parties agree, however, in determining what are fixtures, that the rule announced in *Lavenson* v. *Standard Soap Co.*, 80 Cal. 245, 250 [22 P. 184, 185, 13 Am.St.Rep. 147] is the correct rule: 'In order to determine whether a thing is a fixture or not, we must look at the manner in which it is annexed, the intention of the person who made the annexation, and the purpose for which the premises are used.'

''In *Gosliner* v. *Briones*, 187 Cal. 557, 560 [204 P. 19, 20], the rule is again stated: 'As a general rule, the intent of the parties is a controlling criterion in ascertaining whether property is permanently attached to the land or retains its identity as personalty; the character of the annexation to the land or other realty and the use made of the property are important considerations, but in most cases are subsidiarily em-

ployed for the purpose of testing the intention of the parties (citing many cases).' (See, also, *Breyfogle* v. *Tighe,* 58 Cal. App. 301 [208 P. 1008].)

"The rule is again illustrated in *Oakland Bank of Savings* v. *California Pressed Brick Co.,* 183 Cal. 295, 298 [191 P. 524, 525], as follows.: 'The boilers in controversy were set in the building on the land on a concrete foundation made to receive them and then bricked in by a wall, so as to retain the heat. The heavy machinery was set on concrete blocks built in the ground for that purpose with large bolts or rods brought up through the concrete by means of which the machines were fastened down. The machinery, engine, and boilers were connected together by pipes, rods, shafts, and belts, so that the engine would operate the machinery, and they were all attached for the purpose of using them permanently in the plant in the making of brick. There can be no doubt that they were affixed to the land so as to become real property, under the definition given in section 660.'

"An engraving plant was held to be a fixture and a part of the realty in the case of *In re Post Office Site,* 210 F. 832.

"In *White* v. *Cincinnati etc. R. R.,* 34 Ind.App. 287 [71 N.E. 276], the machinery of a paper mill was held a part of the realty. The court in that case set forth the three elements regarded as a true criterion of an immovable fixture, in this language: 'The united application of three requisites . . . is regarded as the true criterion of an immovable fixture: (1) Real or constructive annexation of the article in question to the freehold; (2) appropriation or adaptation to the use or purpose of that part of the realty with which it is connected; (3) the intention of the party making the annexation to make the article a permanent accession to the freehold.' "

While then, as noted in the Seagren case (50 F.2d 333) *supra,* and as we have just observed, an agreement between landlord and tenant that the latter may remove his fixtures, does not in itself govern the situation as between condemnor and tenant, it is apparently held not to follow that the intention of the tenant himself in installing the fixtures may be disregarded, even as between himself and the condemnor of his leasehold interest. What is condemned, in so far as the tenant is concerned, is his leasehold together with his "improvements pertaining to the realty." The position of the

condemnor is a different one from that of either the purchaser at a voluntary sale or one seeking to realize on some mortgage or other encumbrance that he may hold on the land, in that a condemnor cannot claim to be acting under any possible misapprehension of the effect of a contract. He has made no contract with those whose property he seeks to take. He, therefore, cannot complain if some attention is paid to the purposes for which the latter has annexed chattels to the land on any theory that he was not advised of those purposes.

■ It seems to us, however, that the intent of the tenant in annexing personal property to the land that he leases, which, as between himself and the condemnor of his leasehold, can be recognized as bearing on what the character of such annexed property shall be deemed to be in the condemnation proceeding, is not so much the intent that the tenant may have *expressed,* whether in his arrangement with his landlord or otherwise, as it is the intent which the sort of property involved and the character of his annexation *apparently implies.* In other words, the nature of the property itself and the manner of its annexation are important as evidencing the *intent* with which it is annexed. In this respect the situation, as between condemnor and the holder of a leasehold included in the condemnation, is strongly analogous to that obtaining between the taxing authorities and the holder of a leasehold, as to which it was in *San Diego Trust & Savings Bank* v. *San Diego County,* 16 Cal.2d 142, 149 [105 P. 2d 94, 133 A.L.R. 416], said that:

"As between private parties such as those bearing the relationship to each other of landlord and tenant, . . . their mutual intention as to whether an article is a fixture and part of the realty or is personalty is the controlling factor. As to third persons who are not parties to any such private agreement, however, the intent which controls is not a secret hidden intent but that manifested by the physical facts, giving due consideration to the status of the party by whom the articles have been installed."

See, to the same effect, *Citizens Bank of Greenfield* v. *Mergenthaler Linotype Co.,* 216 Ind. 573 [25 N.E.2d 444, 447-8].

■ The character of the installation, then, is, as to such third parties, and therefore as to a condemnor, important as characterizing the intent with which an annexation has been made. It is also, at least in some degree, important, entirely apart from the question of intent, as an independent ele-

ment to be considered in deciding whether the annexation has made that which is annexed a part of the realty, for it is obvious that some installations are so clearly of a permanent character, and others, on the other hand, so clearly of a temporary nature as to *ipso facto* determine whether the annexed articles thereafter "pertain to the realty" or are personal property only.

In *City of Los Angeles* v. *Klinker, supra,* it appeared that the main building on the property involved was especially designed and constructed to accommodate the permanent installation of the processing equipment.

"Certain floors were designed to carry heavy machinery and equipment not found in ordinary buildings of steel frame. One of the floors above ground surface was designed to carry a load of 275 pounds per square foot. Anticipating expansion, the building was also designed to carry two additional stories, namely a fifth and a sixth story above ground surface. The annex . . . was the same type of construction as the main building, carrying also safety fixtures with reference to load capacity. . . . In the construction of the main building, the foundations for the great presses were constructed independently of, but blending with, the foundations for the building to prevent vibration which might have affected the stability of the building foundations. . . . The pressroom equipment consists of: The large presses . . . on their massive masonry foundations. Presses Nos. 1 and 2 are two stories high and are equipped with runways, ladders and mezzanine landing for the workmen. Other presses are supported by cast iron columns going through the floor to the concrete foundation and are anchored to the masonry bolts embedded therein. The presses are operated by a drive mechanism under the floor, which connects, by gear system, to a series of vertical shafts which drive their individual cylinders. The drive shaft goes to a motor located on a specially constructed base in the sub-basement. The heavy shafting is held on hangers fastened into the ceiling and it comes through the floor and is geared into the press. Removal of the presses embedded in concrete would leave open pits in the floor."

We have quoted in this extent from the description in the opinion, in the case last cited, of the physical situation involved to show how cogent was the proof, there present, of the permanent annexation of the equipment to the realty. To

be sure, there were other features of the equipment which, if taken by themselves, would be less obviously, made part of the building itself, but they were so tied in, in their nature and in the purpose of their use, with the machinery described as to be inseparable from it in the treatment given them.

So growing trees, shrubs and other plants are generally considered a part of the realty to which they are attached by their roots and continue to be such until they are severed when for the first time they become personal property. (*City of Los Angeles* v. *Hughes,* 202 Cal. 731 [262 P. 737], *supra.*)

On the other hand, there are many instances of less permanent attachments which have been held neither to evince any intention to annex the equipment involved to the realty, nor apart from intention, to effect such annexation. For example, in *Southern California H. & M. Co.* v. *Borton,* 46 Cal.App. 524 [189 P. 1022], the vendor under a conditional sales contract had installed in a house belonging to the vendee certain wall beds. The vendee deeded the house with the land on which it stood to a third party who was really an assignee for the benefit of her creditors, and did not pay the vendor for the beds. The latter was held entitled to repossess them. The appellate court, indeed, did not undertake to decide whether or not the beds had become part of the realty or not, holding that in view of the conditional sales contract, whether they did or not no title passed to the vendee until they were paid for, and she could pass none to her assignee. The Supreme Court, however, in denying a petition for a hearing before it, stressed the manner of attachment as a controlling circumstance, saying (p. 531) *inter alia*:

"The beds were not built in the wall with the house nor were they a necessary part of the house itself. They could be taken out without unscrewing any screws or removing any fixtures and the house would remain habitable as before, except that it was not furnished with beds. It is obvious, therefore, that they were not affixed to the building in the ordinary sense of the word so as to become a part of the realty as between the person who sold the same, retaining title in himself, and a subsequent purchaser of the house without notice of such reserved title. These beds were not fixtures but were a part of the furniture of the house, not essentially different from beds of any other description. So far as the opinion of the District Court places the affirmance

upon the proposition that the plaintiff would have effectually retained title to the property as against the defendants, even if the beds had been built in or permanently affixed to the house, we are of the opinion that the question was not involved in the case and was unnecessary to the decision, and we withhold approval of the expressions therein to that effect."

Specifically, with respect to the equipment of filling stations, the only California case that has been called to our attention is *Murr* v. *Cohn*, 87 Cal.App. 478 [262 P. 768]. That indeed is one between landlord and tenants and to that extent distinguishable from the case at bar. However, it was a case in which the written lease affected vacant lots, and was silent as to the use which the tenants were to make of the property (although the lessor was verbally informed that it was to be used as a filling station), or to what, if anything, the tenants were to place upon it, or, if anything was placed upon it, what would be the resulting rights or liabilities of the parties. The tenants placed on the property "one field portable gasoline station, one gasoline air pump, and one gas tank." The court's opinion was to the effect that the tenant was entitled to remove them. It states that:

"The station was put in place by laying pieces of 2 x 4, making a rectangular frame and resting it on the surface of the ground. Thereafter concrete was poured into that frame, covering the space of ground inclosed with concrete four inches deep. The station was set on top, the outside walls of steel rested on the 2 x 4 and were nailed thereto. The pump was placed on a concrete pier, which was also constructed on top of the surface of the ground. The tank was sunk into the ground about seven feet deep."

In *Standard Oil Co. of New York* v. *Dolgin*, 95 Vt. 414 [115 A. 235, 17 A.L.R. 1218], it was held that one who lends a tank to the owner of a garage to aid in the handling of gasoline may recover it from a purchaser of the real estate with notice, although it is buried in the earth to guard against injury and to decrease the fire hazard. It was, among other things, held that upon the question whether or not a gasoline tank became a fixture by being placed underground, evidence was admissible that no material damage was done to it or the land by its removal.

As between landlord and tenant, indeed, it has been very

commonly held that various types of appurtenances of oil filling stations amount to trade fixtures and may, therefore, be removed by the tenant while still in possession of the leased premises. (*Cameron* v. *Oakland County Gas & Oil Co.*, 277 Mich. 442 [269 N.W. 227, 107 A.L.R. 1142]; *Shields* v. *Hansen*, 201 Wis. 349 [230 N.W. 51].)

In *Rucker* v. *Hunt*, 44 Ga.App. 836 [163 S.E. 612], where a filling station was leased by a son from a father without rental payment, and the son, for use therein, installed an air compressor which was merely bolted to the floor, the same was held to continue personal property which the son was entitled· to remove.

So in *Farmer* v. *Golden Rule Oil Co.*, 130 Kan. 803 [287 P. 706], where a parcel of land had been leased by a written lease specifically for use as a gasoline, kerosene and lubricating oil station and a filling station, and the equipment erected by the tenant thereon, the trial court was sustained in denying to one who with knowledge of the terms of the lease purchased the land from the lessor, who was operating the station as agent for the tenant, the right to enjoin the latter before its lease expired from removing the equipment. "The lease," said the Court, "was a comparatively short term lease. The improvement was installed by the tenant for the purpose of trade. The nature of the improvement was such that it could be regarded as personal property."

See, also, *Crater's Wharf* v. *Valvoline Oil Co.*, 196 N.Y.S. 815, where as against one who had purchased the property from the lessor a tenant was permitted to remove filling station equipment.

In *Standard Oil Co.* v. *La Crosse Super Auto Service, Inc.* 217 Wis. 237 [258 N.W. 791, 99 A.L.R. 60], it was held that gasoline pumps and underground tanks installed by the lessee of a filling station under a lease which provided that the lessee should pay all taxes levied or assessed upon the property belonging to it upon the premises, and should have the right at any time within thirty days after the termination of the lease to remove any equipment at any time placed thereon by it, are as between such lessee and a prior mortgagee of the realty, removable by the lessee upon the termination of the lease. The court said *inter alia*:

"We consider the following rule to be just: Where land is mortgaged and the mortgagor is not prohibited from leasing the premises and the premises are in fact leased to one

who installs therein or thereon trade fixtures for temporary purposes connected with his business, or in furtherance thereof, which trade fixtures may be removed without material injury to the freehold upon the termination of the lease, removal of such trade fixtures should be allowed as against the mortgagee.''

But in *Dent* v. *Bowers,* 166 Ark. 418 [265 S.W. 636, 36 A.L.R. 443], it was held that:

''A gasoline filling station consisting of a pump and underground tank placed at the outer edge of the sidewalk in front of a garage passes as a fixture by the sale of the building, notwithstanding the owner of the building had sold it to a tenant whose title had passed to his successors in the tenancy.''

In the annotation to this case in A.L.R. it is noted that the court regarded these appurtenances as fixtures ''by reason of having been used on the premises for about five years by several tenants, taking into consideration also the lack of any definite arrangement between the purchaser of the lot and the grantor that they were personal property and not part of the realty.''

Again, in *Olympia Lodge* v. *Keller,* 142 Wash. 93 [252 P. 121, 52 A.L.R. 795], it was held that a provision in a lease of ground for an auto camp and service station, that all improvements thereon shall become the property of the lessor prevents the removal by the tenant of trade fixtures consisting of gasoline pumps, tanks, oil containers, air compressor, a Luba system, toilet fixtures in the rest room and an electric sign.'' This decision turned on the meaning of the expression ''improvements'' as used in the lease, the court holding it as so used to be broader than the term ''fixtures'' and to contemplate that the appurtenances referred to should remain the landlord's property.

In *Roanoke Marble & Granite Co.* v. *Standard Gas & Oil Supply Co.,* 155 Va. 249 [154 S.E. 518], under a lease which provided that the property was to be used exclusively as a filling station, the lessee to erect the improvements thereon at places designated by the lessor, and all the improvements to belong to the lessor at the termination of the lease, it was held that an underground storage tank ''partook of the nature of a permanent fixture'' and could not be removed by the lessee, as to permit its removal would defeat the intent of the parties as expressed in the lease.

Various other cases in which the status of equipment installed at filling stations has been considered, will be found reviewed in the note appended to the report of the case of *Standard Oil Co.* v. *La Crosse Super Auto Service, supra,* in 99 A.L.R. at page 69 et seq. The author of that note concludes that "while the courts have generally stated that the most important consideration in determining the status of storage tanks and other equipment of a gasoline filling station is the intent of the parties at the time the equipment is installed or attached to the real estate, they have shown a marked tendency to decide each particular case on its own facts, taking into consideration the provisions or lack of provisions of a lease, the character of the article and the manner of its installation or attachment, the effect of its removal on the real estate, the statutory or Code provisions in respect to 'trade fixtures,' and rights arising under chattel or real estate mortgages, conditional sales contracts, and vendors' or mechanics' liens." Perhaps this is as accurate a generalization as in the present state of the decisions relating specifically to filling stations is practicable.

While, however, there are few condemnation cases to be found in the books in which the status of the equipment of filling stations is specifically considered and *United States* v. *Seagren, supra,* may be, in some sort, the pioneer case on that specific point, there have been many cases in which machinery originally belonging to a tenant but in some degree attached to the realty has been involved in an eminent domain proceeding in which the leasehold has been condemned. Such a case was *Jackson* v. *State of New York, supra.* A similar case is *In re Mayor of City of New York,* 39 App.Div. 589 [57 N.Y.S. 657]. Others will be found reviewed in the note to *United States* v. *Seagren* in 75 A.L.R. pp. 1495 et seq. There runs through them the proposition to which we have already alluded, that in a condemnation case the parties do not stand on an equality and that the courts must, therefore, be vigilant to see that no injustice is done the property owner who has no option but to take what is given him. While, therefore, as emphasized in *Jackson* v. *State of New York,* a condemnor will not be allowed at its will to take a tenant's leasehold, surrender to him second hand machinery attached thereto, and pay him only for the value of his term separated from that of his installations, it is not necessarily true, that reciprocally in condemning

his leasehold the condemnor can require him to leave machinery which can be readily detached without damage to the property in so far as the purposes are concerned for which the condemnation is sought. And as was held in *In re Acquiring Property on North River*, 103 N.Y.S. 908, while in condemning for street purposes land improved with a building erected for a factory it is incumbent on the city to pay for such machinery as has become a part of the building, not even the tenant can require it to pay for such machinery as can be readily removed, and will have a substantial value disconnected from the building. If that be true it is manifest that the condemnor cannot compel the tenant to leave such machinery on the premises.

There is another consideration that cannot be ignored in this species of condemnation cases. ''Title to land acquired by condemnation for highway purposes vests in the public only an easement or right of way, together with the necessary incidents for the construction, maintenance and reasonable enjoyment of the same.'' (*People* v. *Olsen,* 109 Cal.App. 523, 532 [293 P. 645], citing Pol. Code, sec. 2631 and *Gurnsey* v. *Northern California Power Co.,* 160 Cal. 699 [117 P. 906, 36 L.R.A. N.S. 185].)

The judgment in the condemnation suit here involved awarded to the People of the State of California ''the right to take and occupy for right of way purposes for a public highway the whole of that certain real property referred to in the complaint as 'parcel 2,' to wit,'' followed by a description of the land involved. It is manifest, therefore, that all which the State took was a right of way. The verdict of the jury copied into the judgment merely fixed the market value of said parcel with the ''improvements thereon'' at $13,000 and that was the amount which, together with their taxable costs, was awarded to the owner and the lessee in a lump sum and divided between them in accordance with their mutual stipulation. Undoubtedly in condemning a right of way which could not be used without removing the improvements from the land, the State was bound to take and pay for such permanent improvements as would lose a substantial part of their value in consequence of their removal, such as the buildings that were on the property when it was condemned. If, however, it be true as held in *In re Acquiring Property on North River, supra,* that ''as to such personal property as can be readily removed and would have a substantial value discon-

nected from the building this rule would not apply," it would seem that the readiness with which equipment can be removed, and whether or not it can be removed without either damaging the freehold or substantially diminishing its own value are elements to be considered in determining whether or not it *is* personal property.

In the case at bar the evidence shows that the pumps involved can be readily unscrewed from their connection with the underground tanks, and that in actual practice they had been unscrewed and renewed every few months. The hoist, though resting on a concrete footing below the surface of the ground, was not attached to the footing and could be and was in fact removed with no other damage to the freehold than to leave a hole of the diameter of its outer cylinder, which could be and was immediately filled in with dirt. None of these articles of equipment would be used by the state upon the property across which it was acquiring the right of way. The question whether they had become a part of the realty was essentially a question of fact for the trial court and its conclusion therein may not be disturbed unless we can say as a matter of law that the evidence does not sustain it. In the circumstances, we think the trial court justified in treating them as personal property, not included in the "improvements pertaining to the realty" and therefore no part of the property for which the jury awarded compensation. It follows that the defendant is not liable to the State for removing them.

The judgment is affirmed.

Thompson, J., concurred.

KELLY, J.—I dissent. A wealth of decisions in California support the view that when a case is tried upon a certain theory, whether within or without the issues presented by the pleadings, the litigants are concluded. The principle on which these decisions rest is that of equitable estoppel, it being held that a party who acquiesces and participates in the trial of an issue without objection as if it arose from the pleadings, when he might have objected on the ground that the issue was not made by the pleadings in the trial court, and where objection might have been met by amendment of the pleadings or otherwise, so that it would have operated less injuriously on the other party than if first made on appeal has thereby

waived the objection and therefore should not be heard to make it on appeal. (2 Cal.Jur. 237 et seq.)

In the instant case the rights of the parties are determined by the prior action in condemnation. The judgment in the condemnation proceeding awards $13,000 to the defendants for the real estate, together with the improvements thereon, and their costs and disbursements incurred in the action. Jurisdiction was expressly reserved by the court to thereafter try to determine the proportions and amounts in which said award of $13,000 is to be allocated as between the defendants Jane P. Joslyn and Walter Church. The judgment does not, as filed, separately assess each and every separate estate or interest therein as required by section 1248 of the Code of Civil Procedure, Subdivision 1. In this section the words "and all improvements thereon pertaining to the realty" are found. I do not believe that this section limits the condemnation to improvements pertaining to the realty. Code of Civil Procedure, section 1240, defines what may be taken in condemnation. Subdivisions 6 and 7 of said section read:

"6. *Rights of way.* All rights of way for any and all the purposes mentioned in section 1238, and any and all structures and improvements on, over, across or along such rights of way, and the lands held or used in connection therewith shall be subject to be connected with, crossed, or intersected by or embraced within any other right of way or improvements, or structures thereon.

"They shall also be subject to a limited use, in common with the owner thereof, when necessary; but such uses, crossings, intersections, and connections shall be made in manner most compatible with the greatest public benefit and least private injury.

"7. *Other Property.* All classes of private property not enumerated may be taken for public use, when such taking is authorized by law."

It will be seen that the provisions of the Statute just cited extend the right to condemn all structures and improvements on, over, across or along such rights of way, without narrowing them to such as pertain to the realty.

After the trial and after judgment entered, a stipulation was entered into by the defendants Joslyn and Church, allocating the proceeds of the judgment, and which said stipulation appears as an exhibit in the instant case. The signifi-

cant clause in this stipulation reads, after referring to Church's lease, "wherein the said Jane P. Clapp is the lessor and Walter Church is the lessee, that all damages fixed and allowed by the Court in said proceeding for condemnation, with reference to the said property, including both the land and fixtures and improvements thereon, shall be divided between the said Jane P. Joslyn and Walter Church by the said Jane P. Joslyn receiving Nine-tenths (9/10ths) of said amount and the said Walter Church receiving One-tenth (1/10th) which shall be taken and accepted by said parties as their full respective rights and interest in said property so being condemned." This stipulation is broad enough to include all improvements, whether pertaining to the realty or not, and the property moved away by Walter Church certainly consisted of equipment placed upon the premises to facilitate the conduct of Church's business. It is true that this stipulation is not between the parties litigant in the instant case and cannot be binding on the State, but it is certainly a definite record of the theory upon which the case was tried. By this stipulation Church received $1,300 for all improvements of whatsoever kind or character on the premises and he cannot now be permitted to assert that he is entitled not alone to that proportion of the judgment but also to some of the improvements.

Such being my view of the case, it is idle to speculate upon the question of "fixtures pertaining to the realty" or to lose ourselves in the fog of decisions. By this stipulation the State became the purchaser and Church the vendor of all the improvements of every kind and character. It would have, perhaps, been better had the Court in the condemnation proceeding asserted its reserved power to allocate the judgment either by approving the terms of the stipulation or otherwise, but whether the court did or not becomes, I believe, immaterial under my view of the case.

Support for the views expressed will be found in *Daniels* v. *Gualala Mill Co.*, 77 Cal. 300 [19 P. 519] ; *Barbour* v. *Flick*, 126 Cal. 628 [59 P. 122] ; *City of Oakland* v. *Wheeler*, 34 Cal. App. 442 [168 P. 23].

The rule of equitable estoppel must be applied when it appears that the rights of litigants depend upon the theory upon which the condemnation case was tried. It is true that most of the decisions on the theory of the case phase have to do with a change of theory on appeal. The reason for the rule,

however, must extend to a separate and distinct case in which the rights and interests of the parties depend upon the theory of an earlier case.

The judgment should be reversed.

Appellant's petition for a rehearing was denied April 12, 1943, and the following opinion then rendered:

THE COURT.—Plaintiffs' counsel, in their petition for rehearing, press upon our attention the case of *Richmond Wharf & Dock Co.* v. *Blake Brothers Co., et al.,* 66 Cal.App. 541 [227 P. 223], cited by them in their reply brief on the original hearing, and which they assume to have been overlooked in our decision because not specifically referred to in the opinion. That case was not overlooked, but deemed inapplicable for the reasons stated by counsel for respondent in his supplemental memorandum in which it was analyzed. If the property there involved was to be treated as pertaining to the realty, the plaintiff in that case who claimed under the condemnee would have no title to it because the defendant there, claiming under the condemnor, would have taken it under the condemnation decree, whereas in the alternative, if it were deemed not to pertain to the realty but to be personal property only, the plaintiff would still have no right to it, since it would in that event belong to another, namely, the party or the assignee of the party who placed it on the premises. In neither alternative had the plaintiff any standing in court to object to its conversion by the condemnor. No parallel state of facts arises in the case at bar.

Some comment is made in the petition upon the circumstance that the judgment was entered on the jury's verdict in the condemnation suit which preceded the present action without the filing therein of any findings other than those contained in the judgment itself. This we think entirely immaterial. The pleadings in that case were not in evidence before the municipal court but, even if they had been, it is not claimed that they specify any particular improvements included in the property sought to be condemned and therefore, unless they did so, findings that the particular items involved in the case at bar were or were not improvements pertaining to the realty could not in the condemnation case have been made.

The petition for rehearing is denied.

Kelly, J., voted for a rehearing.